1

2

3

4

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

7

8

9

10

11

12

13

| | |
|---|---|
| CHELAN COUNTY WASHINGTON,<br><br>                    Plaintiff,<br><br>          v.<br><br>BANK OF AMERICA<br>CORPORATION, a Delaware<br>Corporation, and BANK OF<br>AMERICA, N.A., a national banking<br>association,<br><br>                    Defendants. | NO:  2:14-CV-0044-TOR<br><br>ORDER RE: DEFENDANTS'<br>MOTIONS FOR SUMMARY<br>JUDGMENT AND PARTIES'<br>EVIDENTIARY MOTIONS |

14

15

16

17

18

19

20

          BEFORE THE COURT are Defendant Bank of America, N.A.'s Motion for

Summary Judgment (ECF No. 37), Defendant Bank of America Corporation's

Motion for Summary Judgment (ECF No. 44), Plaintiff's Motion to Strike

Declaration of Lisa Stensgaard (ECF No. 47) and Defendants' Motions to Exclude

Expert Testimony of Brian H. Kelley and Charisse Castagnoli (ECF Nos. 50; 52).

These motions were submitted for consideration without oral argument.  The Court

has reviewed the record and the parties' completed briefing and is fully informed.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 1

BACKGROUND

Plaintiff filed its Second Amended Complaint on July 21, 2014, alleging Defendants were liable for processing three fraudulent fund transfer requests in April 2013.  ECF No. 18.  Defendants moved the Court for summary judgment on April 24, 2015.  ECF Nos. 37; 44.  On April 29, 2015, Plaintiff moved the Court to strike the declaration of Lisa Stensgaard, submitted in support of Bank of America, N.A.'s motion for summary judgment.  ECF No. 47.  The same day, Defendants filed motions to exclude the testimony of Plaintiff's proffered experts, Brian H. Kelley and Charisse Castagnoli.  ECF Nos. 50; 52.

Plaintiff concedes Defendant Bank of America Corporation's motion for summary judgment and does not oppose dismissal of all claims against Bank of America Corporation.  ECF No. 70.  The Court therefore grants the motion (ECF No. 44) and dismisses all claims against Bank of America Corporation.  All further references to "Defendant" in this Order refer only to Bank of America, N.A.

FACTS

Under Washington State law, county treasurers are required to hold and disburse funds for certain public entities.  *See* RCW 36.29.010; *see also* ECF Nos. 38 at ¶ 3; 69 at ¶ 3.  One such public entity in Chelan County, Washington, is the Chelan County Public Hospital District No. 1, also known as the Cascade Medical

1 Center ("Cascade").  ECF Nos. 38 at ¶ 4; 69 at ¶ 4.  This case involves three

2 unauthorized payments from Plaintiff's bank account.

3 Plaintiff has held a number of accounts with Defendant since at least 2008.

4 ECF Nos. 38 at ¶ 6; 69 at ¶ 6.  Two of these accounts are relevant to the matter

5 before the Court:  Plaintiff's main operating account and Plaintiff's direct deposit

6 account.  ECF Nos. 38 at ¶ 9; 69 at ¶ 9.  The main operating account held

7 Plaintiff's tax receipts and other deposits, including deposits from county entities

8 such as Cascade.[1]  ECF Nos. 38 at ¶ 9; 69 at ¶ 9.  Plaintiff's direct deposit account

9 was used to directly deposit funds into employees' accounts using Defendant's

10 Automated Clearing House ("ACH") account services.  ECF Nos. 38 at ¶ 10; 69 at

11 ¶ 10.  The direct deposit account did not normally carry a balance; all payments out

12 of the account were funded by a corresponding transfer of funds into the direct

13 deposit account from the main operating account.  ECF Nos. 38 at ¶¶ 22, 26; 68 at

14 ¶¶ 20, 23; 69 at ¶¶ 22, 26.

15 Prior to 2010, Defendant provided Plaintiff with online banking software

16 called Bank of America Direct ("Direct").  ECF No. 68 at ¶ 6.  In June 2010,

17 _____

18 [1] Cascade maintains a separate account with Defendant for the purpose of receiving

19 payments and that money is then transferred into accounts held in Plaintiff's name

20 for later disbursement.  ECF Nos. 38 at ¶ 3, 5; 39-1 at 29–30; 69 at ¶¶ 3, 5.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 3

1  Defendant informed Plaintiff that its software would be converted to a new online

2  banking platform called CashPro.  ECF No. 68 at ¶ 7.  CashPro contains multiple

3  "modules" for different banking activities.  ECF No. 68 at ¶ 9.  The module

4  dedicated to ACH transactions was not upgraded in the process of converting to the

5  CashPro platform.  *Id.*  Plaintiff and Cascade were still using the Direct ACH

6  module to process ACH transactions when the fraudulent transactions occurred in

7  April 2013.  ECF Nos. 67-1 at 61; 68 at ¶ 14.[2]

8          To process a payroll payment in April 2013, a Cascade employee would first

9  login to the CashPro platform with a unique user ID, company ID, and password.

10  ECF Nos. 38 at ¶¶ 11, 27; 69 at ¶¶ 11, 27.  The platform created a digital

11  fingerprint of each authorized computer and issued a challenge question for login

12  attempts from computers the platform did not recognize.  ECF No. 38 at ¶ 29; 69 at

13  ¶ 29.  The platform would also validate a digital certificate installed on each

14  authorized computer; unauthorized computers were not granted access.  ECF No.

15  38 at ¶ 30; 69 at ¶ 30.  Finally, the CashPro platform would run an automatic fraud

16

17

18  [2] The major security difference between the Direct and CashPro ACH modules was

19  that the CashPro module supported security tokens in ACH transactions while the

20  Direct module did not.  ECF Nos. 67-1 at 59–60; 68 at ¶¶ 10–11.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 4

1    scoring process, analyzing login patterns and behaviors, which would identify

2    high-risk logins for manual review.  ECF No. 38 at ¶ 28; 69 at ¶ 28.

3         Upon login, a Cascade employee with the proper authorization or

4    "entitlement" could select the Direct ACH transfer module to create a payroll

5    payment order.  ECF Nos. 38 at ¶ 11; 68 at ¶ 21; 69 at ¶ 11.  Once the payroll was

6    initiated and approved in the Direct ACH module, Cascade's employee would then

7    email or fax the total dollar amount of the payroll payment to the County

8    Treasurer's office.  ECF Nos. 38 at ¶ 22; 68 at ¶ 22; 69 at ¶ 22.  A County

9    Treasurer employee would then "approve" the payroll by manually transferring a

10   corresponding amount from the main operating account to the direct deposit

11   account.  ECF Nos. 38 at ¶ 22; 68 at ¶ 23; 69 at ¶ 22.  As discussed in detail below,

12   the parties dispute whether Defendant had knowledge of this manual transfer

13   procedure.  ECF No. 38 at ¶ 24; 68 at ¶ 27; 69 at ¶ 24.

14        On Thursday, April 18, 2013, at 12:28 p.m.,[3] the unique login information of

15   Laura Adams, a Cascade employee, was used to sign into CashPro.  ECF Nos. 38

16   at ¶ 55; 69 at ¶ 55.  The CashPro platform validated the digital certificate and

17   digital fingerprint of Adams' computer, and no challenge question was posed.

18   

19   [3] For ease of reference, the Court has converted the time references to Pacific

20   Standard Time.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 5

ECF Nos. 38 at ¶ 56; 69 at ¶ 56.  The user then accessed the Direct ACH module, to which Adams had full access rights, and created a batch payment order for twenty-three recipients to be settled the following day, April 19, 2013.  ECF Nos. 38 at ¶¶ 57–59; 69 at ¶¶ 57–59.  This payment order was approved in the ACH module at 1:44 p.m.  ECF Nos. 38 at ¶ 58; 69 at ¶ 58.  The payment order was picked up by Defendant's internal transfer routing system at 2:10 p.m.[4]  ECF Nos. 38 at ¶ 59; 69 at ¶ 59.  The total amount of the batch payment order was $288,194.00.  ECF Nos. 38 at ¶ 59; 69 at ¶ 59.

A second batch payment order for seventeen recipients was then initiated and also set to be settled on April 19.  ECF Nos. 38 at ¶¶ 61–62; 69 at ¶¶ 61–62.  This second order was approved in the ACH module at 2:12 p.m. and picked up by Defendant's internal transfer routing system at 2:36 p.m.  ECF Nos. 38 at ¶¶ 61–62; 69 at ¶¶ 61–62.  The total amount of the batch order was $111,300.00.  ECF Nos. 38 at ¶ 62; 69 at ¶ 62.

---

[4] Defendant's internal transfer routing program, ACX, picks up transfer requests at regular intervals and either completes orders transferring funds to other Bank of America accounts or sends non-Bank of America transfer orders to an external ACH operator for processing.  ECF Nos. 38 at ¶¶ 18–19; 41 at ¶ 17; 69 at ¶¶ 18–19.

The next day, Friday, April 19, 2013, at 3:22 p.m., the same login information was again used to access CashPro, which again validated the digital certificate and fingerprint. ECF Nos. 38 at ¶ 64; 69 at ¶ 64. A third batch payment order was created for fifty-six recipients with an effective date of Monday, April 22, 2013 (the next business day). ECF Nos. 38 at ¶ 64; 69 at ¶ 64. The order was approved in the ACH module at 4:13 p.m. and picked up by Defendant's internal transfer system at 4:33 p.m. ECF Nos. 38 at ¶¶ 64–65; 40-2 at 6; 69 at ¶¶ 64–65. The total amount of this order was $603,575.00. ECF Nos. 38 at ¶ 65; 69 at ¶ 65.

The three payment orders were created by a third party, or third parties, who gained access to Adams' computer via a computer virus or other malware. ECF Nos. 38 at ¶ 67; 69 at ¶ 67. Adams initially reported strange behavior on her computer to Cascade's information technology department on April 18. ECF No. 38 at ¶ 74; 39-1 at 84; 69 at ¶ 74. Several scans were run on the computer on April 18 and 19 that discovered a virus which was removed on April 19. ECF Nos. 38 at ¶ 75; 69 at ¶ 75. The computer itself remained in service until after the unauthorized transactions were discovered on April 22. ECF Nos. 38 at ¶¶ 75–76; 69 at ¶¶ 75–76.

Theresa Foltz, an accountant in the County Treasurer's office, discovered the fraudulent transfers while reviewing an activity report for the direct deposit

account early Monday morning, April 22, 2013.  ECF No. 39-1 at 55.[5]  Defendant

first learned of the fraudulent transfers when contacted by Plaintiff following

Foltz's discovery.  ECF Nos. 38 at ¶ 66; 69 at ¶ 66.[6]  By that time, all of the ACH

payment orders had been processed.  ECF Nos. 38 at ¶ 66; 69 at ¶ 66.  Transfers

from the first two batch payment orders were processed no later than 11:00 p.m. on

April 18.  ECF Nos. 38 at ¶ 69; 69 at ¶ 69.  Transfers from the third batch order

were processed no later than 11:00 p.m. on April 19.  ECF Nos. 38 at ¶ 70; 69 at ¶

70.

By the morning of April 22, all of the requested payment orders had been

made available to the receiving accounts.  ECF Nos. 38 at ¶ 71; 69 at ¶ 71.  As a

---

[5] Foltz stated in her deposition that each morning she reviewed a report which

showed "any activity done the prior day up until the 2:30 cutoff of the bank."  ECF

No. 39-1 at 54.  The report on the morning of April 19 showed only verified

activity.  *Id.* at 54–55.

[6] The parties dispute the reason Defendant did not know of the transfers sooner.

Defendant contends the delayed knowledge was due to the timing of the payment

orders at the end of the week, while Plaintiff contends the delay was due to

Defendant's "failure to follow appropriate security procedures."  ECF Nos. 38 at ¶

66; 69 at ¶ 66.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 8

result, the direct deposit account held a negative balance of $1,003,069.00.  ECF Nos. 38 at ¶ 66; 68 at ¶ 43; 69 at ¶ 66.  When informed that the transfers were unauthorized, Defendant issued reversals to the receiving banks, but was only able to recover a portion of the transferred funds.  ECF Nos. 38 at ¶ 72; 68 at ¶ 46; 69 at ¶ 72.[7]

## DISCUSSION

### I. Standing

This case involves application of Article 4A of the Uniform Commercial Code as codified in Washington State, RCW 62A.4A-101 *et seq.*[8]  Defendant argues

---

[7] Plaintiff contends that Defendant did not finish contacting the receiving banks until the following afternoon, April 23, and that more expedient processing of the reversals would have allowed more funds to be recovered.  ECF No. 69 at ¶ 72.  The efficacy of post-transfer recovery is not material to the question of liability under Article 4A.

[8] Defendant contends that Plaintiff's contract claim is displaced by Article 4A.  ECF No. 37 at 17–18; *see also* RCW 62A.4A-102 cmt. ("The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article.

1    that Plaintiff does not have standing to bring a claim under Article 4A because the

2    payment orders were issued by Cascade not Plaintiff.  ECF No. 37 at 6.

3         To establish standing, a "plaintiff must have suffered or be imminently

4    threatened with a concrete and particularized 'injury in fact' that is fairly traceable

5    to the challenged action of the defendant and likely to be redressed by a favorable

6    judicial decision."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134

7    S.Ct. 1377, 1386 (2014).  In diversity actions such as this one, a state statute which

8    creates a concrete legal interest may satisfy the injury-in-fact requirement for

9    federal standing, provided the interest is related to the plaintiff's actual injury.  *See*

10   *Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772–773 (2000)

11   ("The interest must consist of obtaining compensation for, or preventing, the

12   violation of a legally protected right."); *Cantrell v. City of Long Beach*, 241 F.3d

13   ───────────────────────────────────────

14   Consequently, resort to principles of law or equity outside of Article 4A is not

15   appropriate to create rights, duties and liabilities inconsistent with those stated in

16   this Article.").  Plaintiff has not defended the contract claim in its response to the

17   motion for summary judgment.  *See* ECF No. 63.  By failing to address this claim

18   in opposition, Plaintiff has abandoned it.  *Cf. Jenkins v. Cnty. of Riverside*, 398

19   F.3d 1093, 1095 n.4 (9th Cir. 2005).  Accordingly, Plaintiff's contract claim will

20   be dismissed with prejudice.

674, 684 (9th Cir. 2001) (holding that a state statute which creates purely prospective relief does not establish Article III standing).

It is undisputed that the funds at issue were disbursed from an account Plaintiff held with Defendant.  It is also undisputed that the loss is allegedly traceable to Defendant's actions in processing the unauthorized transactions. Defendant argues, however, that Plaintiff suffered no actual injury because the money lost "was Cascade's, not [Plaintiff's]," and because "Cascade must reimburse" Plaintiff for the lost money.  ECF No. 81 at 2.  First, the Court notes the logical contradiction in these arguments.  If the lost funds did indeed belong to Cascade, then there would be no need for Cascade to reimburse Plaintiff for their loss.  That Plaintiff would seek reimbursement from Cascade indicates that Plaintiff has suffered injury.

Second, the record before the Court establishes that payment orders were effectuated from Plaintiff's direct deposit account creating a negative balance. Whether Cascade, the County or some other entity eventually covered the loss in that account does not divest the County from suffering the loss to its direct deposit account.

Most importantly, the loss of the funds is redressable under Article 4A. Article 4A requires banks to issue refunds for unauthorized payment orders issued in the name of a customer.  RCW 62A.4A-204(a).  Article 4A defines a "customer"

1   as a person "having an account with a bank or from whom a bank has agreed to

2   receive payment orders."  RCW 62A.4A-105(a)(3).  While it is undisputed that

3   Plaintiff held an account with the bank, the parties dispute whether the payment

4   orders were issued in the name of Plaintiff or Cascade.  ECF Nos. 37 at 6; 63 at 21.

5   The record indicates that the authorization for Cascade to initiate ACH transfers

6   was executed by David Griffiths in his role as the Chelan County Treasurer.  *See*

7   ECF No. 40-1 at 8, 16–18.  While a Cascade employee may initiate the payment

8   orders, they were processed on behalf of Plaintiff and from an account held by

9   Plaintiff.  As such, RCW 62A.4A-204 creates a concrete monetary interest related

10  to the injury Plaintiff suffered.  Plaintiff has standing to pursue the Article 4A

11  claim.

12              II. Evidentiary Issues

13            A. Motion to Strike Declaration

14        Plaintiff moves to strike the declaration of Lisa Stensgaard as a sanction for

15  Defendant's alleged violation of discovery obligations.  ECF No. 47 at 3.

16  Specifically, Plaintiff contends that the declaration was responsive to Plaintiff's

17  document request and Defendant had a continuing "obligation to produce it when it

18  was created."  *Id.*  Defendant contends that there was no obligation to provide the

19  declaration to Plaintiff because (1) it falls under the work product exception to

20  discovery, (2) Plaintiff was aware that Stensgaard possessed discoverable

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 12

information, and (3) the declaration is not a "document" under the purview of Federal Rule of Civil Procedure 26.  ECF No. 55.

Rule 26(b) allows parties to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).  Parties have a continuing obligation to provide requested discovery materials.  Fed. R. Civ. P. 26(e).  However, the rule excludes from the discovery obligations "documents and tangible things that are prepared in anticipation of litigation or for trial" unless "they are otherwise discoverable" and the requesting party shows a "substantial need for the materials."  Fed. R. Civ. P. 26(b)(3)(A).  A document is prepared "in anticipation of litigation" if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."  *In re Grand Jury Subpoena (Torf)*, 357 F.3d 900, 907 (9th Cir. 2004) (quoting 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024 (2d ed. 1994)).

The declaration of a witness prepared in anticipation of filing a motion for summary judgment is a document "prepared in anticipation of litigation."  Such

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 13

declarations "assemble information, sift . . . relevant [facts] from the irrelevant

facts," and can relay legal theory and strategy to those reading it, and, as such, are

not discoverable under Rule 26. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

Moreover, although reduced to written form, the declaration is not a "document" as

understood in Rule 26. Rather, the declaration is in essence proffered testimony,

the substance of which is discoverable through interrogatories or the deposition of

a witness, not through document requests. *See Intel Corp. v. VIA Technologies,

Inc.*, 204 F.R.D. 450, 451–52 (N.D. Cal. 2001). Plaintiff's motion is denied to the

extent the failure to produce the declaration itself is a violation of Defendant's

discovery obligations.

That said, Defendant did have an obligation to disclose the substance of

Stensgaard's declaration as it related to discoverable information Plaintiff

requested by interrogatory. *See* Fed. R. Civ. P. 33. This obligation was a

continuing one and required Defendant to supplement any interrogatories in a

timely manner upon discovery of new information relating to the interrogatory.

Fed. R. Civ. P. 26(e)(1).

Interrogatory No. 20 in Plaintiff's Second Interrogatories requested of

Defendant: "If you contend that Bank of America offered and Chelan County

refused a commercially reasonable security procedure between October 25, 2010[,]

and April 18, 2013, state the dates and substance of each offer and refusal."  ECF No. 77 at 35.

After noting objections to the breadth and vagueness of the interrogatory, Defendant replied substantively:

> . . . BANA refers to and hereby incorporates Savit Pirl's testimony as 30(b)(6) witness related to this topic and BANA's responses to Plaintiff's First Interrogatories.
>
> Without limiting that testimony or BANA's previous answers, BANA specifically states that the security procedures made available to Chelan County through CPO were commercially reasonable at all times during the timeframe identified above, and that Chelan County had the option of selecting—and ability to self-select—the security procedure(s) and combination(s) thereof appropriate to its level of use and risk.  Chelan County was educated on those options and informed of their utility through the methods identified in BANA's response to Interrogatory No. 15.[9]  Chelan County's failure to utilize the additional security features offered in CPO and explained to Chelan County through various methods set forth above constituted a "refusal" of these processes.
>
> More specifically, Chelan County's discussions with BANA personnel regarding security procedures offered by BANA and available to Chelan County include but are not limited to discussions regarding (1) the use of dual account administration; (2) implementation of user entitlements, such as imposing limitations on the authority of one user to both initiate and approve ACH transactions; (3) the use of tokens when opening the Cashpro software; (4) the delegation of ACH

_____

[9] Interrogatory 15 related solely to training opportunities Defendant offered; it did not relate to the communications articulated in Stensgaard's declaration.  *See* ECF No. 56-1 at 14–15.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 15

1    processing to subagencies, such as the Hospital, rather than
     consolidating ACH payment processing in a single county CashPro ID
2    for all agencies; (5) the implementation of monetary limits
     (transactional or daily) on the ACH account; and (6) the implantation
3    of limitations on the identity of individuals and accounts entitled to
     receive ACH transfers from Chelan County's ACH account without
4    additional administrative approval or oversight.

5    ECF No. 56-1 at 18–19.

6            Defendant did not disclose in this response significant facts later reported in

7    the Stensgaard declaration.  These facts include that Stensgaard "had several

8    conversations with the County's representative, Theresa Pinneo, about the

9    County's [security decisions], and [Stensgaard] warned her that the changes to the

10   account structure posed a security risk" as well as that Stensgaard "advised the

11   County repeatedly" to adopt more secure procedures.  ECF No. 42 at 6.  The Court

12   finds that Defendant failed to fully comply with its obligation to provide a

13   complete response to Plaintiff's interrogatory because the response does not

14   identify Stensgaard or indicate that she participated in multiple communications

15   relevant to the interrogatory.

16           However, the Court concludes that exclusion of Stensgaard's declaration or

17   testimony is not a proper remedy.  Because the Court denies Defendant's motion

18   for summary judgment, any prejudice to Plaintiff resulting from the belated

19   disclosure of the substance of Stensgaard's testimony is minimal.  Plaintiff has

20   ample opportunity to prepare for and counter the testimony offered by Stensgaard

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 16

1    at trial.  Further, the Court will consider a request that Stensgaard submit to a

2    deposition, provided the parties cannot reach an agreement on the matter

3    themselves in light of the late disclosure of the substance of her testimony.

4    Because Plaintiff is not prejudiced by the belated disclose, the Court denies the

5    motion to strike the declaration.

6                              B. Motions to Exclude Expert Testimony

7            Defendant moves to exclude the testimony of two experts proffered by

8    Plaintiff.  ECF Nos. 50; 52.  Defendant contends that Brian H. Kelley and Charisse

9    Castagnoli lack "the 'knowledge, skill, experience, training, or education'

10   necessary to testify about bank security."  ECF Nos. 50 at 2, 4–7 (quoting Fed. R.

11   Evid. 702); 52 at 2, 5–7 (same).  Defendant also contends that the proffered expert

12   opinions "will not 'help the trier of fact to understand the evidence or to determine

13   a fact in issue.'"  ECF Nos. 50 at 2, 7–11 (quoting Fed. R. Evid. 702); 52 at 2, 7–

14   10 (same).  Plaintiff opposes the motions, arguing that its proffered experts have

15   the requisite knowledge or experience and that their opinions will assist the Court

16   in evaluating the commercial reasonableness of Defendant's security procedures.

17   ECF Nos. 57; 60.

18           Expert witness testimony is governed by Federal Rule of Evidence 702,

19   which provides:

20           A witness who is qualified as an expert by knowledge, skill,
             experience, training, or education may testify in the form of an

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 17

1    opinion or otherwise if:  (a) the expert's scientific, technical, or other

2    specialized knowledge will help the trier of fact to understand the

     evidence or to determine a fact in issue; (b) the testimony is based on

3    sufficient facts or data; (c) the testimony is the product of reliable

     principles and methods; and (d) the expert has reliably applied the

4    principles and methods to the facts of the case.

5    Fed. R. Evid. 702.

6          In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), the

7    Supreme Court directed trial courts to perform a "gatekeeping" function to ensure

8    that expert testimony conforms to Rule 702's admissibility requirements.  In

9    serving this function, the district court has broad latitude to determine the

10   admissibility of particular expert testimony.  *See Kumho Tire Co. v. Carmichael*,

11   526 U.S. 137, 152–53 (1999).  The Court is not required to hold a hearing before

12   ruling on the admissibility of expert testimony if the record before the court is

13   adequate for such a determination.  *In re Hanford Nuclear Reservation Litigation*,

14   292 F.3d 1124, 1138–39 (9th Cir. 2002).

15         As challenged here, when determining the admissibility of expert testimony,

16   the Court must consider (1) whether each witness has sufficient expertise to be

17   "qualified as an expert by knowledge, skill, experience, training, or education,"

18   and (2) whether the witness's proffered testimony "will assist the trier of fact to

19   understand or determine a fact in issue."  Fed. R. Evid. 702.

20

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 18

"The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993) (citation omitted). "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and citation omitted) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." (citation omitted)). Where a witness has considerable experience working in a specific field, the witness's "lack of particularized expertise" in one aspect of that field, "goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert." *Garcia*, 7 F.3d at 889–90. In such situations, "[v]igorous cross-examination, presentation of contrary evidence, and careful [application of] the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Daubert*, 509 U.S. at 596.

The determination of whether the offered testimony will assist the Court requires the Court to evaluate its relevance and reliability. *See Daubert*, 509 U.S. at 591–92, 597. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The reliability of expert testimony is evaluated in regard to the expert's "basis in the knowledge and

1  experience of his discipline." *Kumho Tire Co.*, 526 U.S. at 148 (1999) (quoting

2  *Daubert*, 509 U.S. at 592).  This inquiry is "flexible" and reliability must be

3  evaluated "in light of the particular facts and circumstances of the particular case."

4  *Id.* at 158; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th

5  Cir. 2014).

6                                     A. Brian H. Kelley

7        Defendant argues first that Brian H. Kelley lacks the requisite qualifications

8  to testify as an expert in ACH security procedures.  ECF No. 50 at 4–7.  Kelley has

9  over thirty-five years of experience in commercial banking.  ECF No. 58 at 6, 21–

10  22.  Between 1999 and 2011, Kelley served as president, chief executive officer,

11  and director of three regional Southern California banks.  *Id.* at 6, 21.  While in

12  those positions, Kelley "directed and oversaw a broad range of deposit and lending

13  activities, including the implementation and oversight of electronic banking

14  services including ACH and On-Line Banking activities."  *Id.* at 6.

15        Defendant contends that "[s]uch experience provides nothing more than a

16  limited perspective on the nature of bank security procedures for ACH

17  transactions, and Kelley lacks the training and exposure required to testify as an

18  expert in this area."  ECF No. 50 at 6.  Defendant objects that Kelley "fails to give

19  any examples of the knowledge he gained from [these] experience[s]."  ECF No.

20  75 at 5.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 20

Having reviewed Kelley's declaration, expert report, and resume, the Court concludes Kelley does have the requisite qualifications to testify as an expert in this matter.  Kelley's extensive history managing banks, including their ACH services, has granted Kelley knowledge of the types of security procedures available to and feasible for banks.  Defendant's objection to Kelley's particularized experience with ACH security procedures is grounds to attack the weight which the Court should assign Kelley's opinions, but does not bar him from testifying from his experience overseeing ACH services in general.  *Cf. Garcia*, 7 F.3d at 889–90.

Defendant argues second that Kelley's testimony should be excluded because it is irrelevant.  ECF No. 50 at 7–11.  Specifically, Defendant contends Kelley's opinions are irrelevant because "he admits that his experience is limited to regional and community banks" and Kelly cannot consequently testify as to the security procedures of international banks similarly situated to Defendant.  *Id.* at 9–10.

As discussed in detail below, resolution of the claim in this case involves determining the "commercial reasonableness" of security procedures employed by Defendant in verifying ACH transactions.  *See* RCW 62A.4A-202(b)(i), (c).  As part of this "flexible" analysis, the Court is guided to look at "security procedures in general use by customers and receiving banks similarly situated."  RCW

62A.4A-202(c), -203 cmt. 4.  Kelley may not have particular experience with international banks, but his general knowledge of banking security and ACH transactions may assist the Court's inquiry in this case.

There is no indication at this time that ACH security standards for international banks vary substantially from standards applicable to regional banks with which Kelley has experience.  Thus, there is no immediate reason to exclude Kelley's testimony as irrelevant given that the standards with which he is familiar may be the same or substantially similar to standards applicable to Defendant.  *See* Fed. R. Evid. 104(b).  Defendant may challenge, by cross-examination or presentation of contrary evidence, whether the standards with which Kelley is familiar are in general use by banks similarly situated to Defendant.  This potential disparity, however, relates to weight, not admissibility.

Finally, the parties dispute whether Kelley can offer testimony as to whether Defendant acted in good faith.  As discussed in detail below, resolution of the claim in this case involves determining whether Defendant accepted the unauthorized payment orders in good faith.  *See* RCW 62A.4A-202(b)(ii).  Defendant must show, *inter alia*, that its employees accepted and executed the payment orders in a way that comported with Plaintiff's "reasonable expectations, as established by reasonable commercial standards of fair dealing."  *Choice*

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 22

*Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 622-23 (8th Cir. 2014).

Defendant contends Kelley's testimony is inadmissible because this particular subject of testimony was not disclosed in Plaintiff's expert report or pre-trial expert disclosures. ECF Nos. 75 at 6. Plaintiff disclosed that its experts would testify to "industry standards and whether [Defendant's] security procedures met these standards." ECF No. 51-1. Plaintiff did not disclose that its experts would testify as to whether Defendant acted on the security procedures in a manner consistent with standards of fair dealing.

Regardless, the Court has reviewed Kelley's report and concludes his "bad faith" opinions do not contain relevant information. Kelley has offered opinions relating to Defendant's allegedly delayed attempts to recovery funds *after* the ACH transactions had been processed. ECF No. 58 at 16–17. Liability under Article 4A relates only to the actions of a bank while processing and accepting ACH payment orders. *See* RCW 62A.4A-202 (. . . the bank proves that it *accepted* the payment order *in good faith* and in compliance with the security procedure . . . ." (emphasis added)). Recovery actions undertaken after an ACH transaction is processed are not encompassed by the Article 4A analysis and any evidence offered on the matter

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 23

1    is irrelevant.[10]  Kelley's opinions regarding Defendant's recovery efforts are

2    excluded.

3                                B. Charisse Castagnoli

4            Defendant also argues that Charisse Castagnoli lacks the requisite

5    qualifications to offer expert testimony.  ECF No. 52 at 5–7.  Castagnoli has "over

6    [twenty-six] years of experience in information security having worked in the

7    design, development, and marketing of secure operating systems, security auditing,

8    network and host based intrusion detection, network firewalls, cryptographic

9    systems, application whitelisting, realtime network security monitoring, threat

10   detection and remediation, mobile device security, and identity and access

11   management."  ECF No. 61 at 4.  Defendant contends Catagnoli lacks the requisite

12   experience or knowledge to testify because she has no "particularized experience

13   analyzing online security practices for banks" or "particular knowledge related to

14   the conduct of large commercial banks in processing ACH transactions."  ECF No.

15   52 at 5, 6.

16

17   _____

18   [10] The Court makes no conclusion whether this evidence would be relevant under

19   other potential claims of liability.  The Court rules only that this evidence is not

20   relevant to the Article 4A claim currently before the Court.


ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 24

However, having reviewed Castagnoli's declaration, expert report, and resume, the Court concludes Castagnoli does have the requisite qualifications to testify as an expert in this matter.  Castagnoli's extensive experience with internet security systems and authentication practices allows Castagnoli to testify as to the types of security procedures available for internet-based banking platforms. Defendant's objection to Castagnoli's particular experience with the ACH security procedures of international banks is grounds to attack the weight which the Court should assign her opinions, but does not bar Castganoli from testifying based upon her general experience with cyber security and authentication procedures.  *Cf. Garcia*, 7 F.3d at 889–90.

Defendant also argues that Castagnoli's testimony should be excluded because it is irrelevant.  ECF No. 52 at 7–10.  Specifically, Defendant contends Castagnoli's testimony "does not explain how banks similarly situated to [Defendant] implemented alternative security procedures in April 2013."  ECF No. 52 at 8.  Castagnoli's report, however, discusses various security procedures widely available at the time of the breach and which were included in "[m]ost modern online banking packages."  ECF No. 61 at 6–11.  This testimony is relevant to the Court's inquiry of whether Defendant used commercially reasonable security procedures.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 25

1    Accordingly, the Court declines to categorically exclude the testimony of

2  Kelley and Castagnoli.  Defendant is free to challenge the opinions offered in order

3  to aid the Court in determining the weight to be given to the testimony.

4  Defendant's motions are denied to the extent they seek to exclude the entirety of

5  the expert testimonies.

6    However, Defendant objects as well to any opinions offered by Kelley and

7  Constagnoli that embrace legal conclusions.  ECF Nos. 50 at 8–9; 52 at 8.  The

8  Court will not consider opinions as to the ultimate legal conclusion in this case, *i.e.*

9  whether the implemented security procedures were commercially reasonable.  *See*

10 *Hangarter*, 373 F.3d at 1016 ("[A]n expert witness cannot give an opinion as to

11 her *legal conclusion*, i.e., an opinion on an ultimate issue of law." (emphasis in

12 original) (citation omitted)); RCW 62A.4A-202(c) ("Commercial reasonableness

13 of a security procedure is a question of law . . . .").  That conclusion rests solely

14 with the Court at the close of the scheduled bench trial.  To the extent Plaintiff's

15 experts opine on the ultimate commercial reasonableness of the security

16 procedures the parties implemented, Defendant's motions are granted.

17            III. Summary Judgment

18    Defendant moves the Court to grant summary judgment in its favor arguing

19 that the undisputed facts indicate it implemented and complied with commercially

20 reasonable security procedures.  ECF No. 37.  Plaintiff opposes this motion,

arguing that there are genuine issues of material fact, that the procedures

implemented were not commercially reasonable, and that Defendant failed to abide

by the procedures the parties agreed to implement.  ECF No. 63.

Summary judgment may be granted to a moving party who demonstrates

"that there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

bears the initial burden of demonstrating the absence of any genuine issues of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to identify specific genuine issues of material fact

which must be decided at trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986).

For purposes of summary judgment, a fact is "material" if it might affect the

outcome of the suit under the governing law.  *Id.* at 248.  A dispute concerning any

such fact is "genuine" only where the evidence is such that a reasonable factfinder

could find in favor of the non-moving party.  *Id.* at 248, 252 ("The mere existence

of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff.").

In ruling upon a summary judgment motion, a court must construe the facts, as

well as all rational inferences therefrom, in the light most favorable to the non-

moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  "[A] district court is not

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 27

1   entitled to weigh the evidence and resolve disputed underlying factual issues."

2   *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).  Only

3   evidence which would be admissible at trial may be considered.  *Orr v. Bank of*

4   *Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

5                              A. Article 4A analysis

6          Article 4A creates a framework by which to balance the rights and

7   obligations of banks and institutional customers concerning electronic funds

8   transfers.  It specifically addresses the balance of risk when a third party obtains a

9   customer's identifying information and attempts to issue a fraudulent payment

10  order to a bank.  Generally, a bank bears the risk for unauthorized orders and must

11  refund the payment of any unauthorized payment.  RCW 62A.4A-204(a).

12  However, in certain circumstances, the risk of loss shifts to the customer and a

13  bank is not liable for refunding unauthorized payment orders.

14         As relevant in this case, a bank is not liable for repayment of an

15  unauthorized payment order if (1) the bank and its customer have agreed to a

16  security procedure by which the authenticity of the payment order is to be verified,

17  (2) "the security procedure is a commercially reasonable method of providing

18  security against unauthorized payment orders," and (3) "the bank proves that it

19  accepted the payment order in good faith and in compliance with the security

20  procedure and any written agreement or instruction of the customer restricting

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 28

acceptance of payment orders issued in the name of the customer."  RCW 62A.4A-202(b).  The burden rests upon the bank to show that the security procedures are commercially reasonable and that the bank acted in good faith in complying with those procedures.  RCW 62A.4A-203 cmt. 3.

"The question of whether loss that may result from the transmission of a spurious or erroneous payment order will be borne by the receiving bank or the sender or purported sender is affected by whether a security procedure was or was not in effect and whether there was or was not compliance with the procedure." RCW 62A.4A-201 cmt.  Thus, as embodied in Section 202(b), the first step of the Article 4A analysis requires the Court to determine the exact framework of the agreed-upon security procedures.  RCW 62A.4A-202(b) ("If a bank and its customer have agreed that the authenticity of payment orders . . . will be verified pursuant to a security procedure . . . .").

A security procedure is "a procedure established by agreement of a customer and a receiving bank for the purpose of . . . verifying that a payment order . . . is that of the customer . . . ."  RCW 62A.4A-201.  This definition specifically limits security procedures to those procedures established by agreement between the parties; it does not apply to procedures the parties may unilaterally impose in processing payment orders.  *See* RCW 62A.4A-201 cmt.  A procedure need not be explicitly referenced in writing so long as ample evidence indicates that the parties

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 29

agreed to implement the procedure. *See* RCW 62A.1-201 ("'Agreement,' as distinguished from 'contract,' means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade. . . ."); *Choice Escrow*, 754 F.3d at 618.

At the second step of the Article 4A analysis, the Court must determine whether the agreed-upon security procedures were commercially reasonable. RCW 62A.4A-202(b)(i).

> Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated.

RCW 62A.4A-202(c). Commercial reasonableness is a "flexible" concept that requires a court to determine "whether the procedure is reasonable for the particular customer and the particular bank." RCW 62A.4A-203 cmt. 4. "The standard is not whether the security procedure is the best available," and a particular security procedure is not unreasonable "simply because another procedure might have been better." *Id.* However, a "security procedure that fails to meet prevailing standards of good banking practice applicable to the particular bank should not be held to be commercially reasonable." *Id.*

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 30

In some situations, an institutional customer may refuse all or portions of a bank's offered security procedures which are "commercially reasonable and suitable for that customer and insists on using a higher-risk procedure because it is more convenient or cheaper," in which case the customer voluntarily assumes the risk of loss. *Id.* In those situations, the security procedures actually in place will be deemed commercially reasonable if

> (i) the security procedure was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for that customer, and

> (ii) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name, and accepted by the bank in compliance with the security procedure chosen by the customer.

RCW 62A.4A.202(c). Thus, as the Eighth Circuit has stated, Sections 202(b) and 202(c) can be synthesized into the following rule:

> in assessing commercial reasonableness, courts consider (1) security measures that the bank and customer agree to implement, and (2) security measures that the bank offers to the customer but the customer declines, as long as the customer agrees in writing to be bound by payment orders issued in its name . . . and accepted by the bank in accordance with another procedure.

*Choice Escrow*, 754 F.3d at 618.

At the third step of the Article 4A analysis, a bank must show that it "accepted the payment order in good faith and in compliance with the security

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIES' EVIDENTIARY MOTIONS ~ 31

procedure and any written agreement or instruction." RCW 62A.4A-202(b)(ii).

Good faith "means honesty in fact and the observance of reasonable commercial

standards of fair dealing." RCW 62A.1-201(b)(20). Thus, "[t]his two-pronged

definition has both a subjective component—honesty in fact—and an objective

component—the observance of reasonable commercial standards of fair dealing."

*Choice Escrow*, 754 F.3d 611, 622 (8th Cir. 2014) (citing *In re Nieves*, 648 F.3d

232, 239 (4th Cir. 2011)).

The subjective prong concerns whether the bank actually complied with the

agreed-upon security procedure. That is, "technical compliance" with the security

procedure. *See Choice Escrow*, 754 F.3d at 623. The objective prong concerns

whether the bank accepted the payment order in accordance with the security

procedures "in a way that reflects the parties' reasonable expectations as to how

those procedures will operate." *Id*. This inquiry focuses on the aspects of

accepting a payment order that are left to the Bank's discretion. *Id.* (citing

*Milford-Bennington R. Co., Inc. v. Pan Am. Rys., Inc.*, 695 F.3d 175, 179 (1st Cir.

2012)). Defendant must show that its employees accepted and executed the

payment orders in a way that comported with Plaintiff's "reasonable expectations,

as established by reasonable commercial standards of fair dealing." *Id.*[11]

---

[11] Though "there may be some evidentiary overlap" between evaluating the

commercial reasonableness of the security procedure and the bank's compliance,

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 32

1

B. Genuine Disputes of Material Fact

2       The parties dispute certain factual issues that are material to the resolution of

3   this case.  Specifically, the parties dispute what security procedures they had

4   agreed to implement and what, if any, alternative security measures were offered to

5   Plaintiff or Cascade, but ultimately refused.

6       There is no dispute that the parties implemented certain agreed-upon

7   security measures.  First, CashPro users were required to enter a company ID, user

8   ID, and password to access the online banking platform.  ECF Nos. 38 at ¶ 27; 69

9   at ¶ 27.  Second, CashPro created a digital fingerprint of each authorized computer

10  and challenged login attempts from unrecognized computers with a security

11  question.  ECF Nos 38 at ¶ 29; 69 at ¶ 29.  Third, logging into CashPro required a

12  valid digital certificate stored on each authorized computer.  ECF Nos. 38 at ¶ 30;

13

14

15

16

_____

17  "the commercial reasonableness inquiry concerns the *adequacy* of a bank's

18  security procedures, [whereas] the objective good faith inquiry" concerns the

19  manner in which the bank complied or acted in accordance with the implemented

20  security procedure.  *Choice Escrow*, 754 F.3d at 623 (emphasis added).

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 33

1  69 at ¶ 30.  Fourth, CashPro employed an automatic fraud scoring process upon

2  login.  *See* ECF Nos. 38 at ¶ 28; 41 at ¶ 12; 69 at ¶ 12.[12]

3        The parties strongly dispute whether other security procedures were agreed-

4  upon.  First, the parties dispute whether they agreed to a "zero-balance" procedure

5  pursuant to which Defendant could not transfer funds out of the direct deposit

6  account until and unless Plaintiff made a corresponding transfer of funds into the

7  account from the main operating account.  *See* ECF Nos. 38 at ¶ 24; 63 at 1–4; 68

8  at ¶¶ 16–27; 69 at ¶ 24; 81 at 10.  In essence, this procedure would have prevented

9  the direct deposit account from being overdrawn or having a negative balance.  *See*

10 ECF No. 63 at 4 ("Nevertheless, [Defendant] processed the Fraudulent Transfers,

11 and created an overdraft of $1,003,069 on an account that was never intended to

12 fall below zero.").

13

   _____

14 [12] Plaintiff disputes whether this system actually analyzed the login patterns related

15 to the April 2013 transactions, but does not dispute that this system was part of the

16 security procedure utilized by CashPro.  *See* ECF No. 69 at ¶ 12.  Plaintiff has not

17 demonstrated there is a genuine dispute on the matter.  *See Anderson*, 477 U.S. at

18 256.  The Court notes, however, that this automatic fraud scoring only analyzed

19 login patterns, it did not perform fraud scoring or monitoring for individual ACH

20 transactions.  *See* ECF No. 67-1 at 80-81.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 34

1    Defendant has presented evidence that County Treasury employees were

2  aware of times when the direct deposit account carried a negative balance.  ECF

3  No. 39-1 at 39, 52–53.  Theresa Foltz, an accountant in the County Treasury office,

4  agreed in her deposition that these negative balances "would have been because a

5  taxing district released an ACH batch before it made a wire request[.]"  ECF No.

6  39-1 at 53.  Based upon these facts alone, in may be that there was no strict zero-

7  balance procedure and that Plaintiff was aware that the direct deposit account

8  could be overdrawn.

9    On the other hand, however, Plaintiff has presented evidence supporting its

10  contention that the parties had agreed to a strict zero-balance procedure.  Plaintiff's

11  chief accountant, Theresa Pinneo, stated in her deposition that the County Treasury

12  employees "had an understanding with [Defendant's] representative," Alex

13  Johnston, that "no money was to go out of that account unless it was funded" from

14  the main operating account.  *Id*. at 33–34.  As such, Pinneo stated, a transfer was

15  required "so that [an ACH payment] could go out" from the direct deposit account.

16  *Id.*  Likewise, David Griffiths, the County Treasurer, stated that Defendant had

17  established the zero-balance system and monitored the direct deposit account for

18  potential overdrafts.  ECF Nos. 64 at ¶ 10(a)-(b), (f); 39-1 at 12.

19    In fact, Johnston himself—Defendant's own employee—stated that he

20  believed Plaintiff had set up the direct deposit "funding arrangement" with the

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 35

1    bank.  ECF No. 67-1 at 26.  Johnston did not state, though, that the arrangement

2    would prevent an overdraft, instead stating only that an overdraft may trigger a

3    telephonic inquiry from the bank.  *Id.* at 27, 30 ("A typical customer response

4    would be, 'Yes, we are aware of it.  We forgot to fund.  We made a mistake.

5    Money's coming in.' The vast majority of these is a timing issue.").

6         In short, while it is undisputed that the direct deposit account was

7    occasionally overdrawn, this fact is not indisputably determinative of whether the

8    parties agreed that the account should never be overdrawn.  It may be that

9    Defendant failed, on more than one occasion, in its responsibility to retain money

10    in the direct deposit account until a corresponding transfer was made from the

11    main operating account.  This possibility, along with testimony indicating there

12    was some as yet unclarified "funding arrangement" between the parties, indicates

13    that further factual development of the record is required.  The evidence Plaintiff

14    presents, however, is such that a reasonable fact finder could find the procedure

15    was agreed-upon.  The Court concludes there is a genuine dispute of fact on this

16    matter.

17         Second, the parties dispute whether there was an agreed-upon procedure in

18    place whereby Defendant was required to notify Plaintiff of any discrepancies in

19    the direct deposit account, the so-called "call-back" procedure.  *See* ECF Nos. 63

20    at 3; 68 at ¶¶ 16–27; 81 at 8–9.  Defendant flatly disputes that the call-back

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 36

1   procedure was an agreed-upon security procedure.  ECF No. 81 at 8.  Plaintiff,

2   however, contends the system was agreed-upon and required a bank representative

3   to contact Plaintiff if Defendant's "system detected a payment order for which

4   funds had not been placed in the Direct Deposit Account."  ECF No. 63 at 3.  In

5   response to the Defendant's motion, Plaintiff offers evidence supporting this

6   contention.

7        Foltz stated that she was made aware of previous overdrafts of the direct

8   deposit account through calls from Defendant.  ECF No. 39-1 at 53.  Griffiths also

9   stated that Defendant established a procedure by which it would monitor the direct

10  deposit account and call the County Treasurer "if there was even the smallest

11  discrepancy."  *Id.* at 12.  Johnston stated that an overdraft of the direct deposit

12  account would trigger a phone call from the bank, "depending on the size" of the

13  overdraft.  ECF No. 67-1 at 27.  He also agreed that an overdraft of $50,000 would

14  trigger an email response.  ECF No. 67-1 at 29.  This evidence is such that a

15  reasonable factfinder could find there was an agreed-upon call-back procedure.

16  *See Anderson*, 477 U.S. at 248, 252.  Further factual development is required,

17  however, to define what, if any, duties the procedure imposed upon Defendant.  A

18  genuine dispute of fact exists on this matter.

19       Finally, the parties dispute whether there was an agreed-upon procedure

20  whereby Plaintiff had twenty-four hours to recognize erroneous or fraudulent

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 37

1    payment orders and to have them reversed in full by Defendant, the so-called

2    "twenty-four hour" procedure.  ECF No. 68 at ¶¶ 30–32; 81 at 8.  Plaintiff has

3    offered evidence in support of the contention that such a procedure was agreed-

4    upon.

5         Pinneo stated that she had a verbal agreement with Johnston on the

6    implementation of this procedure.  ECF No. 39-1 at 33–34.  Griffiths stated that the

7    twenty-four hour procedure was part of the previous paper payment order system,

8    and that both he and Defendant's "Senior Client Manager" believed the twenty-

9    four hour procedure would apply to electronic ACH orders as well.  *Id.* at ¶¶ 15,

10   16.  Johnston attested to a twenty-four window for recovering funds "[i]f there was

11   an unauthorized external ACH debit against [Plaintiff's] account."  ECF No. 67-1

12   at 35.  Johnston, however, did not recall whether he explained to Griffiths that the

13   twenty-four hour limit applied only to external debits.  *Id.* at 36.  The evidence

14   presented is such that a reasonable factfinder could find the twenty-four hour

15   procedure was agreed-upon.  *See Anderson*, 477 U.S. at 248, 252.  As such, there is

16   a genuine dispute of fact on the matter.

17        In sum, there are genuine factual disputes as to whether the zero-balance,

18   call-back, and twenty-four hour procedures were agreed-upon security procedures.

19   These disputes are material to the Article 4A analysis.  Resolution of the step-one

20   inquiry will necessarily affect the outcome of the trial.  Without a resolution of the

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 38

1    preliminary factual inquiry of what security procedures were agreed-upon, the

2    Court cannot evaluate the commercial reasonableness of the overall agreed-upon

3    security framework at step two or whether Defendant acted on the agreed-upon

4    procedures in good faith at step three.  A determination of the exact security

5    procedures the parties agreed to implement is a prerequisite to the rest of the

6    Article 4A analysis.

7         Defendant contends, nevertheless, that even assuming that the zero-balance,

8    call-back, and twenty-four hour procedures were agreed-upon, Defendant

9    "processed the transactions in question in accordance with [Plaintiff's]

10   expectations" and summary judgment is therefore appropriate.  ECF No. 81 at 8–

11   10.  The Court disagrees.  Even assuming *arguendo* that these three procedures

12   were implemented, material factual disputes remain as to whether Defendant acted

13   on those procedures in good faith.

14        First, if these procedures were agreed upon, the evidence is such that a

15   reasonable fact finder could find Defendant failed to comply with the technical

16   requirements of the procedures.  For example, if a strict zero-balance procedure

17   was agreed upon, Defendant failed to hold the funds in the direct deposit account

18   until the required corresponding transfer was made from the main operating

19   account.  Thus, there is a genuine dispute of fact material to the objective good

20   faith inquiry.

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 39

1    Second, if the procedures were agreed upon, the evidence is such that a

2    reasonable fact finder could find Defendant failed to comply with the procedures in

3    a manner reflecting Plaintiff's reasonable expectations.  For example, while the

4    record is incomplete regarding any specific duties Defendant had under the call-

5    back procedure, the Court could find that Defendant failed to comply with

6    Plaintiff's reasonable expectations that an overdraft should have been detected

7    sooner and that Defendant should have contacted Plaintiff regarding the overdraft

8    at some point before Monday April 22, 2013.  Accordingly, even assuming the

9    three disputed procedures were implemented, there are factual disputes material to

10   both prongs of the good-faith analysis.

11   Finally, the Court notes that the parties also strongly dispute whether

12   Defendant offered, and Plaintiff and Cascade refused, alternative reasonable

13   security measures.  Defendant contends that its representative, Lisa Stensgaard,

14   directly communicated security concerns and alternative security measures to

15   Theresa Pinneo.  ECF No. 42 at ¶¶ 11, 13.  Plaintiff contends that Stensgaard did

16   not actually make direct contact with Pinneo at any point to discuss security risks

17   and alternative security matters.  ECF Nos. 63 at 16–17; 48 at ¶ 6.  Given the

18   directly contradictory statements, resolution of this factual issue will likely require

19   a credibility determination by the Court.  Such a credibility determination is not

20   appropriate on a motion for summary judgment, even where the case is scheduled

for a bench trial.  *See TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 684–85 (9th Cir. 1990).  This factual dispute may affect the Court's step-two analysis and is therefore material.  *See Anderson*, 477 U.S. at 248.

"[C]ourts must not rush to dispose  summarily of cases . . . unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue." *Transworld Airlines, Inc.*, 913 F.2d at 684–85.  The Court concludes that further factual development and credibility determinations will affect the outcome of this case.  As such, summary judgment is not appropriate at this juncture.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.  Defendant Bank of America, N.A.'s Motion for Summary Judgment (ECF No. 37) is **GRANTED in part** and **DENIED in part**.  Plaintiff's claim for breach of contract is dismissed with prejudice.

2.  Defendant Bank of America Corporation's Motion for Summary Judgment (ECF No. 44) is **GRANTED**.  All claims against Bank of America Corporation are dismissed with prejudice.

3.  Plaintiff's Motion to Strike Declaration of Lisa Stensgaard (ECF No. 47) is **DENIED**.

4.  Defendants' Motion to Exclude Expert Testimony of Brian H. Kelley (ECF Nos. 50) is **GRANTED in part** and **DENIED in part**.

1        5.   Defendants' Motion to Exclude Expert Testimony of Charisse

2           Castagnoli (ECF No. 52) is **GRANTED in part** and **DENIED in part**.

3       The District Court Clerk is directed to enter this Order and provide copies to

4    counsel.

5        **DATED** July 9, 2015.



                   THOMAS O. RICE
                United States District Judge

ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
PARTIES' EVIDENTIARY MOTIONS ~ 42